American Hydrotherm Corp. v. Commissioner.
American Hydrotherm Corp. v. Commissioner
Docket No. 1427-62.
United States Tax Court
T.C. Memo 1964-48; 1964 Tax Ct. Memo LEXIS 287; 23 T.C.M. (CCH) 381; T.C.M. (RIA) 64048; February 28, 1964
Lincoln Orens, 19 Rector St., New York, N. Y. for the petitioner. Leo A. Burgoyne for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: A deficiency in 1959 income tax of $14,314.23 has been determined. The issue is whether an amount of $27,552.56 is includable in petitioner's gross income as its distributive share of income from a joint venture. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner is a corporation organized and existing pursuant to the Stock Corporation Law of the State of New York, having its principal place of business at No. 1055 Jackson Avenue, Long Island City, New York. Its income tax returns are filed on an accrual basis for the fiscal year ending September 30 of each year. Its tax return for the fiscal year ended September 30, 1959 was *288 filed with the district director of internal revenue, Brooklyn 1, New York. The stockholders of petitioner, their respective offices, and the number of shares owned by each are as follows: Number of shares
Stockholder
Office
Preferred
Common
Paul L. Geiringer
President
25
100
Bernard S. Breitman
Vice-president
12 1/2
25
William Teller
Vice-president
12 1/2
25
Benjamin M. Konis
Treasurer
12 1/2
25
William Diskant
Secretary
12 1/2
25
Total
75
200
On May 28, 1958, petitioner and American Cyanamid Company (hereinafter sometimes referred to as Cyanamid) negotiated a contract (hereinafter sometimes referred to as the Cyanamid contract), which was signed by Cyanamid on or about August 8, 1958 and by petitioner on or about August 18, 1958. This contract provided that petitioner was to [provide] all necessary design, engineering, purchasing and construction services and, design furnish and construct, at a site designated by CYANAMID on its property at Valdosta, Georgia, complete rosin heat treating facilities * * * and was divided into three parts: (1) engineering services, (2) purchasing services, and (3) construction services. *289 Section II of the contract, titled "Fees and Costs," stated: 1. For engineering services performed hereunder CYANAMID shall pay [petitioner], except to the extent previously paid, the sum of $29,500.00. * * *
2. For all purchasing, construction and test run services performed hereunder, CYANAMID shall pay to [petitioner], in accordance with * * * the document entitled, "STANDARD ARTICLES FOR COST-PLUS CONTRACT," * * * the items of cost included in the "Cost of the Work" as defined in Article II of said document, except to the extent previously paid and subject to the provisions of Paragraph 3 of this Section II. 3. Except as otherwise provided in this Paragraph 3, CYANAMID shall in no event be obligated to pay to [petitioner], pursuant to the provisions of Paragraph 2 of this Section II, any amount or amounts, or costs, in excess of $387,575.00. [Petitioner] agrees that any and all such amounts and costs in excess of $387,575.00 incurred by it in connection with the performance of the Work hereunder shall be borne by [petitioner], and any services hereunder that would result in such total amounts and costs exceeding said maximum amount of $387,575.00 shall be *290 performed by [petitioner] at no cost to CYANAMID; * * * provided that if CYANAMID shall make any changes in the scope of the work which have the effect of increasing or decreasing the amount which would otherwise be payable by CYANAMID to the [petitioner] under the provisions of Paragraph 2 of this Section II, then the said maximum amount of $387,575.00 shall be adjusted by an amount to be agreed upon by CYANAMID and the [petitioner]. 4. In addition to paying the amounts and costs set forth under Paragraphs 1 and 2 of this Section II, and as compensation for all services performed hereunder, CYANAMID shall pay to [petitioner], at the conclusion by [petitioner] and the acceptance by CYANAMID of the work hereunder * * * a fee of $22,925.00. In addition CYANAMID shall pay twenty-five per cent (25%) of the amount, if any, by which the agreed maximum amount of $387,575.00, or such revised maximum amount, if any, as is arrived at under the provisions of Paragraph 3 of this Section II, exceeds the total amounts and costs paid and payable to [petitioner] by CYANAMID under the provisions of Paragraph 2 of this Section II. * * * Article II of the document "Standard Articles for *291 Cost-Plus Contract," which was incorporated into the Cyanamid contract, provided, inter alia, that: 2. The "Cost of the Work" as used in this contract shall also include an amount equal to 125% of salaries, exclusive of premium pay, reimbursable under Paragraph 1(c), above, the same to cover all other [petitioner's] overheads including, without limitation, payroll taxes, insurance, allowances for vacations, employee benefit plans and other fringe benefits paid with respect to such salaries and all other [petitioner's] costs incurred for full performance hereunder and not otherwise specifically provided for. The Cyanamid contract also contained the following provision: All covenants and agreements herein contained shall be extended to and be binding upon the successors and assigns of [petitioner] and CYANAMID, excepting that [petitioner] shall not assign this contract or any moneys to become due hereunder except with the written consent of CYANAMID. This was the first contract petitioner had made which called for the construction of a large building as well as electrical and piping installation. Petitioner, on or about June 19, 1958, entered a joint venture agreement *292 in writing with James H. Merritt & Co. (hereinafter sometimes referred to as Merritt), under which it was agreed that the joint venture - to be known as American Hydrotherm Associates (hereinafter sometimes referred to as Associates) - would "execute a certain construction order for the installation of a chemical plant for American Cyanamid Co. in Valdosta, Georgia," with the exception of the portion of the Cyanamid contract dealing with petitioner's engineering services. Under the joint venture agreement, petitioner was to: 1. perform all necessary work with respect to the equipment, control, structural, and electrical portion of the construction order; 2. do all purchasing for Associates, with Merritt assisting in the purchase of piping, valves, installations, and all other materials pertaining to Merritt's duties; and 3. supervise the construction engineering work and keep in touch with, and direct the activities of, the resident engineer. The joint venture agreement provided that Merritt would, inter alia: 1. provide the necessary funds to finance Associates without charging Associates for the financing; 2. supervise and check the piping work; and 3. perform all *293 administrative work, including the keeping of books, for Associates. The joint venture agreement provided, as to the division of profits and losses, that: * * * It is understood and agreed that all profits and losses incurred by [Associates] shall be shared as follows: 60% by [petitioner] and 40% by Merritt. * * * Any and all obligations arising from the guarantees hereinafter referred to shall be likewise assumed in the ratio of 60% for [petitioner] and 40% for Merritt. * * *
Upon completion of the contract, [Associates] shall close its books, prepare the closing financial statements, and distribute any profits as heretofore provided. In the event of a loss, [petitioner] shall refund to Merritt 60% of the loss incurred by [Associates]. The profit will be paid, as provided, 40% to Merritt and 60% to [petitioner] or to the persons designated by [petitioner]. The agreement further stated that: * * * This agreement constitutes the entire agreement between the parties and no modification thereof shall be binding unless in writing. Petitioner, some time between the last week of June and July 15, 1958, notified Cyanamid that it was assigning the contract *294 to Associates, comprised of petitioner and Merritt. On August 8, 1958, Cyanamid forwarded to petitioner for its signature two signed copies of the Cyanamid contract. In an accompanying letter, Cyanamid, referring to the proposed assignment of the contract to Associates, stated: When returning the executed Contract, you may wish to submit your assignment form, assigning this Contract to * * * Associates. Under date of August 13, 1958, the contract between Cyanamid and petitioner was assigned in writing to Associates as follows: KNOW ALL MEN that the undersigned, [petitioner], does hereby sell, assign, transfer and set over unto * * * ASSOCIATES * * * a certain contract entered into between [petitioner] and * * * CYANAMID * * *, dated August 7, 1958, except that there is specifically excluded from said assignment the payment of $29,500.00 required to be made to [petitioner] for engineering services pursuant to Section 2, Paragraph 1, of said contract, * * * and it is understood and agreed by and between the assignor and the assignee that the said payment of $29,500.00 shall be made directly to [petitioner]. * * *
On or about August 18, 1958, petitioner returned *295 to Cyanamid a duly signed copy of the contract, notifying Cyanamid in an accompanying letter of the assignment of the contract to Associates. At no time was Cyanamid informed that Associates consisted of anyone other than petitioner and Merritt. The corporate minutes of petitioner contain no reference to the contract between petitioner and Cyanamid, nor do they refer to either the agreement between petitioner and Merritt or the assignment of the Cyanamid contract to Associates. *
At the date the joint venture agreement was entered into, petitioner was indebted to the Bank of New York in an amount between $80,000 and $120,000. On or about February 27, 1957, petitioner had executed and delivered a letter of undertaking to the Bank of New York which provided, inter alia, that petitioner would refrain "from borrowing any money except from you." This commitment was still in force as of the date of the joint venture agreement. Associates maintained a bank account at the Bankers Trust Company. In a joint letter written in June 1958 to Bankers Trust, petitioner and Merritt directed the bank "to honor and pay drafts, checks or other instruments or orders for the *296 payment of money drawn against the account when signed jointly by one person from Group I and one person from Group II." "Group I" was composed of two persons named by Merritt "or any other person or persons designated by resolutions of the Board of Directors of [Merritt], or designated by authorized officers of said corporation." "Group II" was composed of two officers of petitioner "or any other person or persons designated by resolutions of the Board of Directors of [petitioner], or designated by authorized officers of said corporation." Petitioner filed with Bankers Trust a copy of a resolution, dated June 24, 1958, approving and authorizing "the opening of a deposit account with Bankers Trust Company entitled '* * * Associates' substantially upon the terms and conditions stated in the form of agreement * * *." * Each of Associates' checks was signed by a person designated by petitioner and a person designated by Merritt. On August 13, 1958, the date of the assignment to Associates, the Cyanamid contract had no ascertainable fair market value. On or about July 31, 1958, the books and records of Associates showed the following: Purchases of merchandise
$14,326.08
Purchases of engineering
127.30
Other costs
92.30
General and administrative
expenses
9.27
*297 The time spent by petitioner's officers and the amount charged Associates by petitioner to and including July 2, 1958 was as follows: Amount
Officer
Hours
charged
Paul L. Geiringer
100
$ 878.82
Bernard S. Breitman
0
0
William Teller
72
450.00
Benjamin M. Konis
271
1,755.64
William Diskant
166
1,110.00
Total
609
$4,194.46
The time spent by petitioner's officers and the amount charged Associates by petitioner, in toto, was as follows: Amount
Officer
Hours
charged
Paul L. Geiringer
194
$ 1,760.07
Bernard S. Breitman
0
0
William Teller
404
2,732.50
Benjamin M. Konis
398
2,628.77
William Diskant
610
4,167.50
Total
1,606
$11,288.84
Associates filed a U.S. Partnership Return of Income, Form 1065, for the period ended April 30, 1959, showing ordinary income of $45,920.94. The books and records of Associates as of February 28, 1959 showed the following distribution of "profit": Recipient
Amount
Merritt
$20,312.70
Paul L. Geiringer
12,734.53
Bernard S. Breitman
3,183.63
William Teller
3,183.64
Benjamin M. Konis
3,183.63
William Diskant
3,183.63
Petitioner (for typing work,
telephoning, and purchasing
assistance)
5,000.00
$50,781.76
*298 On April 30, 1959, there was an additional distribution "for profit participation in accordance with Joint Venture Agreement" on the Cyanamid contract of $83.51 to petitioner and $55.67 to Merritt, which, when added to the foregoing amount of $45,781.76, results in the total of $45,920.94 shown on the Partnership Return of Income. In his deficiency notice, dated February 5, 1962, respondent gave the following "explanation of adjustment": (a) Examination of the books and records of * * * Associates for the period from July 1, 1958 to April 30, 1959 discloses that ordinary income in the amount of $45,920.94 was correctly reported. It has been determined that your distributive share (60%) of the ordinary income amounts to $27,552.56 * * *. Inasmuch as you have not reported any distributive share of income from * * * Associates, your gross income for the taxable year ended September 30, 1959 has been increased in the amount of $27,552.56. Associates consisted only of Merritt and petitioner and did not include petitioner's stockholders. Opinion Viewing the present issue as a factual one, it is impossible to treat the evidence as carrying petitioner's burden of proving that there *299 ever was an assignment of either the burdens or benefits of the Cyanamid contract from petitioner to its stockholders. It is more realistic to regard what happened as an assignment by petitioner of a 40 percent interest to Merritt in consideration of the latter's agreement to perform a part of the services required and retention of the remaining 60 percent by petitioner. That the form of the transaction was the creation of a joint venture between Merritt and petitioner need not be debated. In order to sustain petitioner's contention it would be necessary to go much further and find that some joint venture was formed, not between petitioner and Merritt, but between Merritt and petitioner's stockholders, eliminating petitioner entirely. We can discern no evidence to support this. On the contrary, the record seems to lead only to the determination that both the Cyanamid contract and the agreement forming the joint venture preclude any such relationship. Cyanamid required notice in writing of any assignment, and it was advised only of the joint venture between Merritt and petitioner. And the terms of the joint venture provided that it embodied the entire contract and could be altered *300 only in writing. No such provision appears and no such written change was made as would constitute the creation of the interest in its stockholders for which petitioner contends. We have hence found as a fact that petitioner and not its stockholders was the member of the joint venture. At most, the idea of including the stockholders seems to us to have been an unsuccessful afterthought. As a matter of law, the services for which the income in controversy was received were performed by petitioner, (C.A. 8, 1939), affirming , and, even had the contract provided for payment to the stockholders, the income would still have been that of petitioner. ; Decision will be entered for the respondent. Footnotes
*. So stipulated.↩